Filed 5/21/24  In re E.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re E.S., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E082512 |
| Plaintiff and Respondent, | (Super.Ct.No. J291902) |
| v. | OPINION |
| T.H., et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Conditionally affirmed, remanded with directions.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant T.H.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant S.S.

1

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

A mother and father appeal from orders terminating parental rights over their minor child. Mother argues the county welfare department's inquiry into their child's possible Indian ancestry under the Indian Child Welfare Act (ICWA) was inadequate, as it omitted several extended relatives.[1] Father argues the juvenile court abused its discretion by failing to apply the beneficial parental bond exception to adoption. We find no abuse of discretion in the court's decision that the beneficial parental bond exception did not apply. The department's ICWA inquiry, however, was insufficient. We therefore conditionally affirm the termination of parental rights and remand for additional inquiry.

BACKGROUND

*A. Dependency*

Defendants and appellants T.H. and S.S. are the mother and father of the child E.S. (born 2021). In October 2021, plaintiff and respondent San Bernardino County Children and Family Services (the department) investigated a referral alleging mother and child both tested positive for marijuana at the child's birth. Mother admitted to using marijuana while pregnant with the child, and continuing to use it after giving birth. Mother acknowledged that she had older children with which she failed to reunify, a

---

[1] Undesignated statutory references are to the Welfare and Institutions Code. "In addition, because ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

history of substance abuse, and a history of mental health issues with a current diagnosis for an anxiety disorder. Father also admitted to using marijuana daily.

In January 2022 the department detained the child and filed a dependency petition. The petition alleged the child came within section 300, subdivision (b)(1) (failure to protect), based on both parents' substance abuse issues, mother's ongoing mental health issues, mother's previous failure to reunify with the child's siblings, father's criminal history, father leaving the child in mother's care while he knew or should of known doing so presented a risk of harm, and father's prior child welfare history. Later that month both parents tested positive for amphetamines and marijuana.

The court held a jurisdiction and disposition hearing in April 2022. It found true all the allegations except those concerning father's criminal history and child welfare history, which it dismissed. The court removed the child from the parents' care and left her in her then-current placement. It bypassed mother's reunification services, but ordered services for father. It also ordered supervised visits twice a week for two hours each.

Throughout the reunification period, father's visits were appropriate. The child at least initially appeared more attached to father than mother. Father played with the child appropriately. He brought toys, books, and food for her, played blocks with her, engaged in imaginary play, blew bubbles, "changed her diaper, wiped her nose, and praised and redirected her appropriately." In general he protected and supported the child, reinforced appropriate roles and boundaries, identified and met her physical and emotional needs,

3

set appropriate limits, demonstrated effective discipline strategies, and otherwise showed an interest in and focus on the child and her activities.

Father's attendance at visits was generally good, though he was often late and missed a few visits. According to the department, father missed eight visits, but father testified it was closer to six.

In May 2022, the child was placed with the person who would become her prospective adoptive parent. By March 2023 the department reported she was "thriving in her current placement, . . . bonded with her caregiver, . . . and all her needs appear to be met." She continued to develop appropriately and to demonstrate a positive emotional attachment to her caregiver.

In March 2023, the court held a 12-month status review hearing, found there was not a substantial probability of return to father's custody, and terminated reunification services. In July 2023, the department recommended the child be freed for adoption by her current caregiver. The child had adjusted well and was comfortable in her caregiver's home, knew the routine, seemed happy and called the caregiver " 'momma.' "

The court held a contested section 366.26 hearing in July 2023. Father testified that he was the child's primary caregiver for her first eight months of life. During that time he was responsible for waking her up, bathing her, feeding her, playing with her, and taking her to doctor's appointments. He testified that during visits she was always happy to see him, that she calls him " 'daddy,' " that she calls out to him as soon as she sees him, that she would run from the caregiver to him, and that she said goodbye and

4

gave him hugs and kisses at the end of visits. The caregiver testified she was willing to allow father future contact, including "allow[ing] him more visits," because father "has put forth more effort to spending time with [the child]."

During the hearing, the court indicated it was "inclined to okay a legal guardianship rather than termination of parental rights," in part "because of the caregiver's insistence that mom and dad will be in this child's life no matter what." The court continued the matter and requested briefing and argument from all counsel.

Before the continued hearing could be held, the caregiver informed the department that she did not want a legal guardianship, but would still agree to adoption. Meanwhile, father argued in his briefing prior to the continued section 366.26 hearing that the court should apply the beneficial parent-child relationship exception to adoption, and set the permanent plan as a legal guardianship.

The court held the continued section 366.26 hearing in October 2023. Father again argued the court should apply the beneficial parent-child relationship exception. Nevertheless the court found clear and convincing evidence the child was adoptable, that "termination of parental rights would not be detrimental to [her]," and no exception applied.

*B. ICWA*

Both parents consistently denied any Indian ancestry throughout the dependency. In addition, mother's history with the department meant it had records of her consistently denying Indian ancestry going back at least a full year. In each of mother's previous cases, the courts found ICWA did not apply to mother's other children.

Mother identified one extended family member, a maternal grandmother, but did not provide any contact information for her. Mother later also identified the child's maternal grandfather. The department did not attempt to contact the maternal grandmother until March 2023. When they did so, she did not answer the phone and did not call back. The department did not contact the maternal grandfather.

Father initially identified two paternal aunts, a paternal stepgrandmother, a paternal great-aunt, and a paternal cousin.[2] He also provided phone numbers for each. He later identified four additional paternal relatives, who are either father's siblings or half siblings of the child (the record is unclear).[3]

---

[2] Father initially identified one person as the child's sister, and another as their aunt, but the department later reported they were actually the child's paternal aunt and great-aunt respectively.

[3] The department's report indicates these four relatives are father's siblings, but the department's brief says they now believe these are the child's half siblings. We need not resolve this ambiguity, as either way they were identified paternal relatives, who would qualify as extended relatives under ICWA, and whom the department did not contact or attempt to contact. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

In September 2022, the department contacted two paternal aunts, a paternal great-aunt, and a sister, all of whom denied any Indian ancestry. One of the paternal aunts and the paternal great-aunt consistently denied any Indian ancestry throughout the dependency.

The department attempted to contact the paternal cousin and paternal stepgrandmother, but the cousin's line was disconnected and the call to the paternal stepgrandmother went to voicemail. The department tried to call both of them again in January 2023, but by then both lines were disconnected.

In March 2023 the department left a voicemail with a second paternal cousin, but did not hear back.

The department did not attempt to contact the other four extended paternal relatives, whose exact relationship to the child is uncertain.

ANALYSIS

Mother and father argue the department failed to conduct a sufficient initial inquiry as required by California law implementing ICWA because it failed to ask identified extended family members whether E.S. may be an Indian child. The department concedes its inquiry did not include certain identified paternal extended family members but argues that it was not required to inquire of them and, in the alternative, that its failure to do so was not prejudicial. Father also argues the trial court erred when it did not apply the beneficial parental bond exception. We conclude the

7

department did not conduct a sufficient inquiry under ICWA, but that the trial court did not err by terminating father's parental rights.

*A. ICWA*

ICWA establishes minimum national standards "for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." (25 U.S.C. § 1902.) Under California law, the juvenile court and county child welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); see *In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*D.F.*, at p. 566.) Only the initial duty is at issue in this appeal.

The initial duty applies in every dependency. (*In re J.S.* (2021) 62 Cal.App.5th 678, 686; see § 224.2, subd. (b).) The initial duty expands under subdivision (b) of section 224.2 when a child is removed from their home. Under that provision, "[i]f a child is placed into the temporary custody of a county welfare department pursuant to Section 306," the department's obligation includes asking the "extended family members" about the child's Indian status. (§ 224.2, subd. (b).) The Judicial Council revised rule 5.481 of the California Rules of Court to implement section 224.2,

subdivision (b), by requiring inquiry of extended family in every case in which the department seeks to place the child. (Cal. Rules of Court[4], rule 5.481(a)(1).)

Opinions from our division disagree on whether that rule of court correctly interprets the statute by requiring the department to inquire of extended family members in every case where a child is removed from home. (Compare *In re Robert F.* (2023) 90 Cal.App.5th 492 (*Robert F.*), review granted July 26, 2023, S279743 [holding the duty does not apply where a child is removed via protective custody warrant] with *In re Delila D.* (2023) 93 Cal.App.5th 953 (*Delila D.*) review granted Sept 27, 2023, S281447 [holding the duty applies in all cases where children are removed from home].) We find persuasive those cases holding the duty applies in all cases—such as *Delila D.* and its progeny—and adopt their reasoning and conclusions.

Applying *Delila D.* to this case, the department's initial duty of inquiry— including the duty to inquire of extended family members who become available—was triggered when a social worker received the child from the peace officer who executed the detention warrant and the department then maintained the child in temporary custody, as authorized by section 306, subdivision (a)(1).

The department concedes it failed to ask certain identified extended family members about the child's potential Indian heritage. Specifically, the department failed to inquire of a maternal grandfather and at least four paternal relatives. Therefore, there is no dispute that the department erred in its initial inquiry.

---

[4] Undesignated rules references are to the California Rules of Court.

Nevertheless, when an appeal concerns "the agency's duty of initial inquiry, only state law is involved. Where a violation is of only state law, we may not reverse unless we find that the error was prejudicial." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742, italics omitted.) This means we must remand only "where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Id*. at p. 744.)

Here, there is some reason to believe the failure to inquire with maternal grandfather was harmless error. The department previously removed the child's half siblings from mother's custody, all of whom were found to have no Indian heritage. Assuming those ICWA inquiries were sufficient, maternal grandfather's information may not "bear meaningfully upon whether the child is an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.)

However, the department's failure to investigate paternal family members was not harmless. While those family members the department was able to contact said the child did not have Indian heritage, the department made only belated and minimal attempts to contact three identified paternal family members and made no effort at all to contact four others. While there is some confusion about whether the four individuals it did not attempt to contact are father's siblings or the child's half siblings, either way they are extended family members who "would likely have shed meaningful light on whether there is reason to believe" the child is an Indian child. (*Benjamin M.*, *supra*, 70

Cal.App.5th at p. 744.)  We also have no reason to believe this information is not readily available.

Accordingly, we conditionally affirm but remand and direct the department to complete its ICWA inquiry with respect to identified and reasonably available extended relatives.

### B.  Beneficial Parental Bond Exception

"By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 (*Jasmine D.*).) Adoption is the Legislature's preferred permanent plan.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)  "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D*., at p. 1350.)

To avoid this outcome, the parent must show that termination of parental rights " 'would be detrimental to the minor' due to any of certain specified circumstances." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.)  One circumstance, the parental bond exception, applies where the parent can show they "have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  There are three elements to this exception:  "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child[ren] such that (3) the termination of parental rights would

11

be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*), italics omitted.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) For the second element, courts may take into account "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*) As for the third element "in assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632, italics omitted.)

On review, we apply the substantial evidence standard to the findings on the first two elements and a hybrid standard for the third. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) Specifically, we review whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship for abuse of discretion. (*Id.* at p. 640.) But we review any factual findings underlying that decision for substantial evidence. (*Ibid.*) In doing so, we look only at the evidence admitted at the 366.26 hearing. (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 207-208.) This hybrid standard embodies the principle that as the reviewing court, we may not " 'substitute [our] own

judgment as to what is in the child's best interests for the trial court's determination in that regard.' " (*Caden C*., at p. 641.)

The department concedes father satisfied the first element and we accept the concession. Therefore, the only question is whether the trial court erred by concluding he failed to meet the other two elements. We conclude that regardless of whether father met the second element, the record is sufficient to demonstrate father did not meet the third element.

Sufficient evidence supported a finding that adoption would bring significant benefits. By the time of the section 366.26 hearing, the child had been out of father's care for most of her life. Indeed, she was placed with the prospective adoptive parent when she was under a year old and has remained in that caregiver's care for over two years of her less than three years of life. This care was consistently positive and stable, and the child seems well bonded to her caregiver. Allowing the caregiver to adopt the child was unlikely to be disruptive and likely to permanently solidify a living situation that was already working.

More importantly, there is little evidence the child would experience significant material or emotional harm from terminating her relationship with father. Father presented evidence that his visits with the child went well, that she referred to him as " 'daddy,' " and that she was always excited to see him. But this is evidence of a beneficial bond, not necessarily evidence that terminating that bond would be more detrimental than adoption. (See *In re Dy.P.* (2022) 76 Cal.App.5th 153, 167 [fact that the

children "often called mother 'mom' or 'mommy' " supported second element].) There was no evidence that E.S. had behavioral issues when separating from father, or that she was otherwise emotionally attached to father such that terminating their relationship would cause her harm. (Cf. *ibid*. [fact that "the children would sometimes get upset at the end of the visits when they had to leave their parents" supported third element].) This is not surprising. The child spent all but eight months of her life outside father's care, and she spent much of that time with her caregiver. Thus, though we have no reason to doubt there is mutual affection between father and the child, there is also no reason to believe that terminating this relationship would harm the child.

Thus, viewing the evidence in the light most favorable to the court's order, we conclude it did not abuse its discretion by deciding the costs of terminating father's parental rights did not outweigh the benefits of obtaining a final, stable, permanent custody arrangement.

In support of a different conclusion, father argues the juvenile court erred by failing to consider on the record each of the factors our Supreme Court identified in *Caden C.*, specifically citing *In re M.V.* (2023) 87 Cal.App.5th 1155 (*M.V.*). However, *M.V.* is distinguishable. The reviewing court in *M.V.* reversed because the juvenile court considered improper factors or otherwise misapplied the standard, not because the court failed to conduct a sufficient on the record analysis. Specifically, the juvenile court's analysis of the second element was erroneous because it found only that there was a bond between the parents and the children, not that there was " 'substantial, positive, emotional

14

attachment to the parent[s]—the kind of attachment implying that the child would benefit from continuing the relationship.' " (*Id.* at p. 381.)  As to element three, the reviewing court found the juvenile court's analysis improper because it considered improper factors. (*Id.* at pp. 382-383.)  In short, the juvenile court in *M.V.* erred "[b]y failing to determine whether M.V. had a substantial, positive attachment to her parents, and by relying on improper factors in assessing detriment," not because it failed to properly explain its analysis.  (*Id.* at p. 383.)

In contrast, *In re A.L.* (2022) 73 Cal.App.5th 1131 expressly rejected father's argument, stating "we are aware of no requirement . . . that the juvenile court, in finding the parental benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception.  To the contrary, we infer . . . that the court is not required to make findings when it concludes that parental rights termination would not be detrimental."  (*Id.* at p. 1156, italics omitted.) We find this reasoning applicable, and fatal to father's claim of error.

## DISPOSITION

The order terminating mother and father's parental rights is conditionally affirmed, and the court's finding that ICWA does not apply is vacated.  The matter is remanded to the juvenile court with directions to comply with the inquiry provisions of ICWA and of sections 224.2 and 224.3—and, if applicable, the notice provisions as well—consistent with this opinion.  If, after completing the initial inquiry, neither the department nor the court has reason to know the child is an Indian child, the order

15

terminating parental rights will remain in effect.  If the department has reason to know the child is an Indian child, the court shall proceed accordingly.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
                                                                                              J.

We concur:


McKINSTER
          Acting P. J.

CODRINGTON
          J.